[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 1, 2005
THOMAS  K. KAHN
CLERK

No. 04-12218

D. C. Docket No. 03-00024-CR-FTM-29-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIZABETH MARIE MORSE THOMPSON,
JOSEPH JAMES STRATTON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(September 1, 2005)**

Before TJOFLAT, PRYOR and ALARCÓN[*], Circuit Judges.

_____

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

ALARCÓN, Circuit Judge:

Joseph James Stratton appeals from the judgment entered following his conviction for conspiracy to possess with the intent to distribute cocaine and cocaine base in violation of 21 U.S.C. § 846. He contends that the evidence was insufficient to support the judgment. He also maintains that the District Court committed reversible error in denying his motion for a severance, and in refusing to grant his motion for a new trial.

Elizabeth Marie Morse Thompson seeks reversal of the judgment entered following her conviction for conspiracy to possess cocaine and cocaine base in violation of 21 U.S.C. §846, and two counts of possession with intent to distribute cocaine base in violation of 21U.S.C. § 841. She contends that the District Court erred in denying her motion to suppress her confession and her motion for a mistrial based upon the alleged misconduct of the prosecutor in arguing to the jury that she had the right not to testify.

We affirm Mr. Stratton's judgment of conviction because we conclude that the evidence was sufficient to sustain it. We also determine that the District Court did not abuse its discretion in denying Mr. Stratton's motion for a severance and his motion for a new trial. We also affirm the judgment of conviction entered against Ms. Thompson because we conclude that the District Court did not err in

2

denying the motion to suppress her confession, and rejecting her motion for a mistrial, or a curative instruction.

We vacate the District Court's sentencing decisions regarding each Appellant. The Government has correctly and forthrightly conceded the sentencing decision error based on the subsequent decision of the Supreme Court in *United States v. Booker,* 125 S. Ct. 738 (2005), and this Court's decision in *United States v. Shelton,* 400 F.3d 1325, 1332-33 (11th Cir. 2005).

I

Ms. Thompson's and Mr. Stratton's criminal activities came to the attention of law enforcement through a telephone call to Margarita Nelson, a Vice Narcotics Investigator of the Collier County Sheriff's Office. At that time, she was assigned to a Drug Enforcement Administration ("DEA") Task Force. Sometime during September of 2002, Timothy McNulty told Officer Nelson that Ms. Thompson and Mr. Stratton were involved in distributing cocaine and crack cocaine. He informed Officer Nelson that Ms. Thompson was selling drugs out of her apartment in the Bermuda Isle subdivision in Naples, Florida. Officer Nelson was given similar information from Gary Bloom in December of the same year. Mr. McNulty and Mr. Bloom provided the information in an attempt to help their mutual paramour, Anita Choquette, who was in jail on unrelated charges, to receive a lesser

3

sentence.

As a result of these tips, Officer Nelson initiated an investigation. Members of the DEA Task Force intermittently surveilled the Bermuda Isle apartment from October of 2002 to March of 2003. They observed several individuals entering the apartment and leaving after only a short period – activity that, in Officer Nelson's experience, was consistent with her informants' reports that drug sales were taking place at the apartment. Officers also observed Mr. Stratton in the vicinity of the apartment on three occasions.

In early 2003, the DEA Task Force carried out controlled purchases of cocaine from Ms. Thompson using Mr. Bloom as a purchaser. Mr. Bloom telephoned Mr. Stratton's home several times but was unable to reach him. On February 14, 2003, Mr. Bloom successfully contacted Ms. Thompson by telephone. He told her that he had had a "hard day." Mr. Bloom testified that a "hard day" was a coded request for crack cocaine. Ms. Thompson told Mr. Bloom to come over to her apartment later that day.

The officers outfitted Mr. Bloom with two electronic recording devices. He went to Ms. Thompson's apartment. William Ingersoll, who was staying with Ms. Thompson, answered the door and let Mr. Bloom enter the apartment. Inside, Mr. Bloom encountered Ms. Thompson. He told her that he needed $400 worth of

4

crack cocaine. Mr. Bloom waited while Ms. Thompson cooked some powder cocaine into crack. Upon paying for the crack cocaine, Mr. Bloom left the apartment and turned the drugs over to Officer Nelson.

On February 25, 2003, Mr. Bloom made a second controlled purchase of crack cocaine from Ms. Thompson at the Bermuda Isle apartment. Mr. Bloom was wearing an electronic monitoring device. Mr. Bloom purchased $625 worth of crack cocaine from her.[1] After purchasing the crack cocaine, Mr. Bloom left the apartment and gave the controlled substance to Officer Nelson.

Members of the DEA Task Force executed a search warrant on the Bermuda Isle apartment on March 6, 2003. When the officers entered the apartment, they encountered Mr. Ingersoll and Ms. Thompson. The officers searched the apartment. They discovered a small amount of crack cocaine,[2] three digital scales, and various items of drug paraphernalia. The officers also seized several documents, including jewelry sales receipts, cellular phone bills in Mr. Stratton's name in care of Ms. Thompson, and a "caller id" list that included Mr. Stratton's number.

---

[1]Mr. Bloom testified that he purchased $400 of crack cocaine with cash provided by officers. Ms. Thompson gave him an additional $250 of crack as payment for work Mr. Bloom had performed on Ms. Thompson's brother's house.

[2]Officer Nelson testified that the net weight of the crack was 88 milligrams.

At the conclusion of the search, officers arrested Mr. Ingersoll on state charges of possessing drug paraphernalia and took him to Collier County jail. The officers took Ms. Thompson to the DEA office in Naples. At the DEA office, the officers read Ms. Thompson her *Miranda* rights. She signed a written waiver of those rights. Ms. Thompson told the officers that she had used cocaine since 1996. She admitted that she started selling cocaine in 1999. She said that she would sell up to a half ounce of cocaine daily and that she received two to three shipments of cocaine from her supplier, whom she identified as Mr. Stratton.

On March 20, 2003, officers arrested Mr. Stratton. The officers searched Mr. Stratton and found a cell phone, a pager, two checks, two pieces of paper that appeared to contain a record of financial transactions, and a monthly statement from a self-storage facility in Ms. Thompson's name.[3] The officers did not find any drugs on Mr. Stratton's person or in his car. They also did not search Mr. Stratton's home.

Ms. Thompson and Mr. Stratton were charged with conspiracy to possess with intent to distribute cocaine and crack cocaine. Ms. Thompson was also

---

[3]Officer Nelson testified at trial that the two pieces of paper seized on Mr. Stratton reflected drug transactions. Mr. Stratton testified that the figures on one piece of paper recorded the amounts of freon he had removed and replaced in automotive air conditioning units at his work. He testified that he had made the notations on another piece paper when helping Deanna Prince calculate payroll figures at her job.

charged with two counts of possession with intent to distribute and distribution of crack cocaine. Ms. Thompson and Mr. Stratton were tried jointly before a jury. Mr. Stratton testified in his own defense. Ms. Thompson did not testify. Following a five-day trial, the jury found Ms. Thompson and Mr. Stratton guilty on all counts.

The District Court sentenced Mr. Stratton to 292 months in prison to be followed by four years of supervised release. Ms. Thompson was sentenced to 360 months in prison on each of her three convictions, to be served concurrently, and was given eight years of supervised release. This timely appeal followed.

I

Mr. Stratton attacks the sufficiency of the Government's evidence to support his conspiracy conviction in two respects. First, Mr. Stratton protests that the only evidence the Government presented against him consisted of the testimony of "convicted drug dealers, drug addicts, liars, cheats, and thugs who were cooperating for their own personal interests." Second, Mr. Stratton contends that, even if the testimony of the Government's witnesses were credited, the Government established at most that Mr. Stratton had a buyer-seller relationship with Ms. Thompson and others, which is insufficient to support a finding of a conspiracy to distribute drugs.

We review a challenge to the sufficiency of the evidence de novo. *United States v. Majors*, 196 F.3d 1206, 1210 (11th Cir. 1999). "When a jury verdict is challenged on the ground of sufficiency of the evidence, the reviewing court must view the evidence in the light most favorable to the government and determine whether the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Young*, 39 F.3d 1561, 1565 (11th Cir. 1994). In conducting this review, we "accept[] all reasonable inferences and credibility choices made in the government's favor, to determine whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Calhoun*, 97 F.3d 518, 523 (11th Cir. 1996). "For the evidence to support a conviction, it need not 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'" *United States v. Perez-Costa*, 36 F.3d 1552, 1556-57 (11th Cir. 1994) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982)).

After reviewing the record, we conclude that the evidence presented at trial was sufficient to support Mr. Stratton's conviction. To sustain Mr. Stratton's conviction for conspiracy to possess cocaine and crack cocaine with intent to

8

distribute, the Government was required to "prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Lopez-Ramirez*, 68 F.3d 438, 440 (11th Cir. 1995). "The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action." *United States v. Guerre*, 293 F.3d 1279, 1285 (11th Cir. 2002).

A parade of Government witnesses testified to Mr. Stratton's involvement in cocaine distribution. Gary Bloom testified that beginning in 2000, he regularly purchased small quantities of cocaine from Mr. Stratton and Ms. Thompson for his personal use and sale. Chris Kahlmorgan, an admitted drug dealer, testified that he met Mr. Stratton about October of 2000, at which point Mr. Stratton was already involved in the distribution of cocaine. According to Mr. Kahlmorgan, Mr. Stratton had a reputation in Collier County of supplying high quality cocaine. From November of 2000 to February of 2002, Mr. Kahlmorgan purchased cocaine from Mr. Stratton on a regular basis, which he converted to crack for his personal use or sale.[4] On several occasions, Mr. Kahlmorgan converted powder cocaine to crack in Mr. Stratton's presence. Mr. Kahlmorgan further testified that he twice

---

[4]Mr. Kahlmorgan testified that his business with Mr. Stratton was "very steady" and estimated that he purchased about seven kilograms of cocaine from Mr. Stratton from November of 2000 to February of 2002.

delivered cocaine to Ms. Thompson on behalf of either Mr. Stratton or Mr. Stratton's live-in girlfriend, Deanna Prince.[5]

Rene Benitez, Mr. Kahlmorgan's girlfriend, corroborated Mr. Kahlmorgan's testimony. She testified that starting around Thanksgiving of 2000, she and Mr. Kahlmorgan would purchase cocaine from Mr. Stratton on nearly a daily basis. She said that she and Mr. Kahlmorgan would use some of this cocaine and convert the rest to crack and sell it.

Anthony Alphonse, a drug dealer and friend of Mr. Kahlmorgan, testified that he accompanied Mr. Kahlmorgan to Mr. Stratton's house to purchase cocaine on four occasions, though he did not personally witness these transactions.

Ronald Watson testified that he purchased about one or two grams of cocaine from both Mr. Stratton and Ms. Thompson "a couple of times a month" over a period of two years.

Timothy McNulty testified that he lived with Ms. Thompson from about June to August of 2002. During this period, Mr. McNulty served as Ms. Thompson's "do boy," which Mr. McNulty explained meant that he delivered cocaine on Ms. Thompson's behalf. Mr. McNulty testified that he would pick up

---

[5]Mr. Kahlmorgan testified that Mr. Stratton and Ms. Prince worked together distributing cocaine, although in his view Ms. Prince's role was a minor one.

10

powder cocaine from Mr. Stratton, and deliver the cocaine to Ms. Thompson. He picked up cocaine from Mr. Stratton on average six or seven times a week. He and Ms. Thompson would then convert the powder cocaine to crack. Mr. McNulty delivered most of this crack to Ms. Thompson's customers. He and Ms. Thompson smoked the rest. Mr. McNulty testified that Ms. Thompson's drug distribution business was active "[e]very single day, 24 hours a day," and that Ms. Thompson maintained a running tab with Mr. Stratton.

Viewed in the light most favorable to the Government, this evidence supports the jury's finding that Mr. Stratton and Ms. Thompson conspired to distribute substantial amounts of cocaine in the Collier County area. The evidence demonstrates that Mr. Stratton's role in the conspiracy was to supply Ms. Thompson, a professional drug dealer, a steady source of high-quality powder cocaine, most of which she converted into crack cocaine and sold. Mr. Stratton occupied a similar role with respect to several other drug dealers.

Mr. Stratton contends that the Government's evidence was insufficient because it depended on the testimony of a series of unsavory characters. While acknowledging that credibility determination are generally the exclusive province of the jury, Mr. Stratton argues that the testimony of the Government's witnesses was "unbelievable on its face and incredible as a matter of law." We disagree.

11

"The fact that [a witness] has consistently lied in the past, engaged in various criminal activities, [and] thought that his testimony would benefit him . . . does not make his testimony incredible." *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976). For testimony to be considered incredible as a matter of law, "it must be unbelievable on its face, i.e., testimony as to facts that [the witness] could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985) (quotation marks omitted) (alteration in original).

Mr. Stratton cites instances in which the testimony of certain Government witnesses was inconsistent with the testimony of witnesses who testified on his behalf. As this argument represents nothing more than an invitation to this Court to revisit the credibility determinations of the jury, we reject Mr. Stratton's argument that the testimony of the Government's witnesses was incredible as a matter of law. "It is well-established that '[c]redibility determinations are the exclusive province of the jury.'" *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997) (quoting *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990)) (alteration in original).

Mr. Stratton contends that, even if the testimony of the Government's witnesses were credited, the evidence establishes at most the existence of a buyer-

seller relationship between himself and Ms. Thompson. We disagree. While "the existence of a simple buyer-seller relationship alone does not furnish the requisite evidence of a conspiratorial agreement," *United States v. Bascaro*, 742 F.2d 1335, 1359 (11th Cir. 1984), an agreement to distribute drugs "may be inferred when the evidence shows a continuing relationship that results in the repeated transfer of illegal drugs to [a] purchaser." *United States v. Johnson*, 889 F.2d 1032, 1035-6 (11th Cir. 1989).

The Government established at trial the existence of a continuing relationship between Mr. Stratton and Ms. Thompson in which Mr. Stratton would supply Ms. Thompson cocaine, the bulk of which she would distribute to customers in Collier County. From this evidence, a jury could find beyond a reasonable doubt that Mr. Stratton agreed with Ms. Thompson to distribute cocaine and crack. *See*, *e.g.*, *United States v. Burroughs*, 830 F.2d 1574, 1581 (11th Cir. 1987) (rejecting the defendant's argument that he was a "mere supplier" of cocaine where evidence showed that the defendant knew his purchasers were couriers from Jacksonville, he maintained a "continued interest in the drugs up to and beyond their sale in Jacksonville," and he sometimes sold to his purchasers on credit).

## II

13

Mr. Stratton argues that the District Court erred in denying his motion to sever his trial from Ms. Thompson's. "[B]ecause of the 'well-settled principled that it is preferred that persons who are charged together should also be tried together,' particularly in conspiracy cases, the denial of a motion for severance will be reversed only for abuse of discretion." *United States v. Smith*, 918 F.2d 1551, 1559 (11th Cir. 1990) (quoting *United States v. Morales*, 868 F.2d 1562, 1571 (11th Cir. 1989)). To demonstrate that the District Court abused its discretion in denying his severance motion, Mr. Stratton must establish "that he was somehow prejudiced by a joint trial" and that severance was the appropriate "remedy for that prejudice." *United States v. Blankenship*, 382 F.3d 1110, 1122 (11th Cir. 2004). Severance is mandatory only if (1) "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants," or (2) if a joint trial would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

"The first scenario for mandatory severance (or mistrial) described by the [Supreme] Court exists only where a joint trial leads to the denial of a constitutional right." *Blankenship*, 382 F.3d at 1123. As for the second scenario, this Court has explained that a joint trial may prevent a jury from reliably assessing guilt where "compelling evidence that is not admissible against one or

more of the co-defendants is to be introduced against another co-defendant." *Id.*

Mr. Stratton argues that the District Court abused its discretion in denying his motion for severance for two reasons. First, Mr. Stratton maintains that severance was required because the District Court admitted Ms. Thompson's post-arrest statements implicating him as her supplier of narcotics. Because Ms. Thompson did not testify, Mr. Stratton argues that the admission of this evidence violated his Sixth Amendment right of confrontation as construed in *Bruton v. United States*, 391 U.S. 123 (1963).

We reject this argument because the admission of Ms. Thompson's post-arrest statements did not result in a *Bruton* violation. Following her arrest, Ms. Thompson admitted to officers that she had been addicted to cocaine since 1996. She told officers that her addiction gradually increased and that in 1999 she began selling cocaine. Ms. Thompson identified Mr. Stratton as her cocaine supplier. The Government introduced Ms. Thompson's confession at trial through the testimony of Officer Nelson. Officer Nelson's testimony did not contain any reference to Mr. Stratton or to Ms. Thompson's "source of supply."[6] The district court also gave the jury an appropriate limiting instruction, admonishing it that testimony concerning

---

[6]While Mr. Stratton asserts that Officer Nelson indirectly referred to Mr. Stratton by referring to Ms. Thompson's source of supply, this assertion finds no support in the record.

15

a defendant's post-arrest statement "should not be considered in any way whatever as evidence with respect to any other defendant on trial."[7] Accordingly, the admission of Ms. Thompson's post-arrest statements did not violate Mr. Stratton's right of confrontation. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (holding that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence"); *See United States v. Williamson*, 339 F.3d 1295, 1303 (11th Cir. 2003) ("In *Richardson*, the Supreme Court clearly authorized the admission of a nontestifying codefendant's confession where such confession omitted reference to the defendant and was coupled with a limiting instruction.").

Mr. Stratton's second argument for severance is that while there was overwhelming evidence that Ms. Thompson was involved in drug trafficking, the evidence against him consisted only of the self-serving testimony of "criminals, drug addicts, liars, cheats and thugs." Mr. Stratton maintains that "it is probable

---

[7]The District Court charged the jury that "the case of each defendant should be considered separately and individually. The fact that you may find any one of the defendants guilty or not guilty of any of the offenses charged should not effect [*sic*] your verdict as to the other offense or any other defendant."

16

that the overwhelming evidence produced against Thompson spilled over to" him.

Mr. Stratton's conclusory assertion that he was prejudiced by the "spillover effect" of the evidence admitted against Ms. Thompson falls well short of satisfying his burden to establish that he suffered "specific and compelling prejudice to the conduct of his defense" as a result of the joint trial. *United States v. Liss*, 265 F.3d 1220, 1227 (11th Cir. 2001). Evidence of the controlled buys of drugs from Ms. Thompson as well as the drugs and drug paraphernalia seized at her apartment would have been admissible at a separate trial of Mr. Stratton to prove that Mr. Stratton had more than a buyer-seller relationship with Ms. Thompson. While the evidence of Ms. Thompson's post-arrest statement would not have been admissible in a separate trial of Mr. Stratton, "[t]he mere fact that there may be an 'enormous disparity in the evidence admissible against [one defendant] compared to the other defendants' is not a sufficient basis for reversal." *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997).

Because Mr. Stratton has failed to demonstrate that he suffered prejudice from his joint trial with Ms. Thompson, we conclude that the District Court did not abuse its discretion in denying Mr. Stratton's motion for severance.

## III

Mr. Stratton's third claim of error is that the District Court abused its

17

discretion in denying his motion for a new trial. Following his conviction, Mr. Stratton moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure[8] on the basis of newly discovered evidence. Mr. Stratton argued that he had unearthed evidence that Jason Osceola and Government witnesses, Chris Kahlmorgan and Anthony Alphonse, had conspired to frame Mr. Stratton in order to protect Anthony Alphonse's father, Ron Alphonse, who was the actual source of their cocaine.

Mr. Stratton's alleged newly discovered evidence consisted of an affidavit from Tracy Cure who attested that in 2002, she was living in Naples, Florida with her boyfriend, Mr. Osceola. Ms. Cure stated that in 2002 Mr. Osceola was selling cocaine that he obtained from Mr. Anthony Alphonse. Mr. Alphonse's source of supply, in turn, was his father, Ron Alphonse. Ms. Cure alleged that she was told by Mr. Anthony Alphonse, Mr. Kahlmorgan, and Mr. Osceola that in the event

---

[8]Rule 33 of the Federal Rules of Criminal Procedure provides in relevant part:

> (a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
> (b) Time to File
> > (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict of finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

they were arrested, they would tell the police that Mr. Stratton was their cocaine supplier. She asserted that she recalled a party at which she overheard Mr. Anthony Alphonse and Mr. Kahlmorgan discussing setting up Mr. Stratton. She also overheard Mr. Anthony Alphonse state that his father was not going to "go down" and that they were going to "take Joe Stratton down."

"When a defendant discovers new evidence after trial that was unknown to the government at the time of trial, a new trial is warranted only if: '(1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result.'" *United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir. 1995) (quoting *United States v. Garcia*, 13 F.3d 1464, 1472 (11th Cir. 1994)). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995). The District Court denied Mr. Stratton's motion for a new trial, ruling that Mr. Stratton failed to establish the last four elements. We review this ruling for an abuse of discretion. *Starrett*, 55 F.3d at 1554.

The District Court did not abuse its discretion in denying Mr. Stratton's motion for a new trial. The record shows that Mr. Stratton was aware of Ms.

19

Cure's existence and of her involvement in drugs before his trial began. Indeed, Ms. Cure states in her affidavit that Mr. Stratton "encouraged [her] to get off drugs and relocate away from Naples so that [she] would not be around the people that were using drugs." The only reasons Mr. Stratton offers for the failure to interview Ms. Cure before his trial was that she lived in North Carolina and that no one knew that she had information relevant to his case.

We agree with the Government that a defendant does not demonstrate due diligence by showing that he failed to interview a potential witness because he or she lived in another state. While Mr. Stratton asserts that he was not aware that Ms. Cure had useful information, he was aware of her involvement in drug activities. The District Court did not abuse its discretion in determining that the new evidence Mr. Stratton presented was not of such nature that it would probably produce a different result at a new trial. Mr. McNulty's testimony provided compelling evidence of a conspiracy between Mr. Stratton and Ms. Thompson to distribute cocaine. Mr. McNulty was subjected to extensive cross-examination at trial which revealed his motivation for cooperating with authorities. Testimony that Mr. Kahlmorgan and Mr. Anthony Alphonse had conspired to frame Mr. Stratton would not impeach Mr. McNulty's testimony. Further, we find it implausible that a jury would accept Mr. Stratton's contention that Mr.

20

Kahlmorgan was covering for Ron Alphonse when Mr. Kahlmorgan testified at trial that Mr. Anthony Alphonse had a reputation among drug dealers in Collier County for supplying excellent cocaine.

Because Mr. Stratton has not demonstrated two of the five requirements for a new trial based on newly discovered evidence, we conclude that the District Court did not abuse its discretion in denying his motion for a new trial.

IV

Ms. Thompson asserts that her confession was involuntary because the officers who interrogated her denied her request for Lorcet, a prescription narcotic drug that was removed from her home, until after she made an inculpatory statement. This Court reviews a district court's factual findings supporting the denial of a motion to suppress for clear error, and in the light most favorable to the Government. The application of the law to the facts is reviewed de novo. *United States v. Holloway,* 290 F.3d 1331, 134 (11th Cir. 2002).

The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial. *Bram v. United States*, 168 U.S. 532, 542 (1897); *United States v. Vera*, 701 F.2d 1349, 1365 (11th Cir. 1983). We focus our voluntariness inquiry "on whether the defendant was coerced by the government into making the statement: 'The relinquishment of the right must have been

21

voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). "The district court must consider the totality of the circumstances in assessing whether police conduct was 'causally related' to the confession." *Id.* (quoting *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Id.* Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. "Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

At the suppression hearing, Officer Nelson and Ms. Thompson testified about the raid on Ms. Thompson's apartment, her arrest, and her subsequent statements to police. Officer Nelson testified that when officers executed the warrant on March 6, 2003, Ms. Thompson and Mr. Ingersoll were present in the apartment. Both were detained while officers conducted a search, which lasted about two hours. Officers read Ms. Thompson her *Miranda* rights. Neither Ms.

22

Thompson nor Mr. Ingersoll invoked these rights. Toward the end of the search, Ms. Thompson stated that she was having back pain. Officers then took Ms. Thompson to the DEA office for questioning. Officers brought Ms. Thompson's Lorcet pills with them to the DEA office because they thought that the jail would want to know what medication Ms. Thompson was taking.

At the DEA office, Officer Nelson again read Ms. Thompson her *Miranda* rights. Ms. Thompson signed a written waiver of these rights. Officer Nelson testified that at the beginning of the interview, Ms. Thompson was visibly upset and nervous but did not appear to be under the influence of drugs or alcohol. Ms. Thompson gave coherent answers to the officers' questions. She also attempted to reach Mr. Stratton by phone to set up a controlled purchase of cocaine. Officer Nelson said that officers gave Ms. Thompson some Lorcet at the end of the interview when Ms. Thompson was about to be taken to jail. Asked why she gave Ms. Thompson the medication, Officer Nelson testified that Ms. Thompson "stated that she had back pain, that it was past due for her medication." Officer Nelson denied that the medication was withheld from Ms. Thompson to coerce her cooperation, or that the medication was given to Ms. Thompson as a reward for her statements.

Ms. Thompson testified that she was prescribed Lorcet by a podiatrist to

treat pain in her back, leg, and ankle. She said that she asked agents to get her pills as they were leaving the apartment. She also stated that the agents placed her pills directly in front of her during the interrogation. She stated that she made several requests for her medication while at the DEA office but in each case, the officers told her to wait. She further testified that the officers did not give a reason for denying her the pills. Ms. Thompson stated that, although the officers did not expressly condition her receipt of her medication on providing a statement, she inferred from the officers' actions that she would need to cooperate if she wanted her medication.

Ms. Thompson also testified that she had taken some Lorcet shortly before officers executed the search warrant but that at the time of her interview she was no longer under the influence of the drug. She stated that, depending on the dosage, Lorcet could diminish her comprehension of what was going on around her. Ms. Thompson also said that she was under the influence of cocaine during the interview. Upon further questioning, however, she testified that she could not specifically recall whether she was under the influence of cocaine during the interview and that she probably was not under the influence.

In his Report and Recommendation, the magistrate judge found that agents did not induce Ms. Thompson to make a statement by withholding her pain

medication. This finding is supported by the record. The only evidence that officers withheld Ms. Thompson's medication in an effort to coerce a statement from her consists of Ms. Thompson's vague testimony that the officers' behavior – namely, their alleged "rude gestures" and laughter in response to her request for her medicine – implied such a *quid pro quo* arrangement. Ms. Thompson's testimony was contradicted by that of Officer Nelson, who denied that the Lorcet was given to Ms. Thompson in exchange for her cooperation.

The district court adopted the magistrate judge's credibility determination regarding the conflicting testimony on the voluntariness question. *United States v. Kreczmer*, 636 F.2d 108, 110 (5th Cir. Unit B 1981). *See United States v. Raddatz,* 447 U.S. 667, 680-81 (1980) (holding that a district court may adopt as the credibility findings contained in a magistrate judge's report and recommendation regarding the voluntariness of a confession without rehearing the testimony of the witnesses who testified at a suppression hearing before the magistrate judge). "Absent any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring [a defendant's] statements and consent to search involuntary." *United States v. Barbour,* 70 F.3d 580, 585 (11th Cir. 1995). The District Court did not err in denying Ms. Thompson's motion to suppress her post-arrest statements.

25

V

Ms. Thompson contends that the prosecutor's comments to the jury

regarding her right not to testify violated her Fifth Amendment right to remain

silent at trial. This Court review's a district court's denial of a motion for a mistrial

based on a prosecutor's statements during closing argument for abuse of

discretion. *United States v. Brooks,* 670 F.2d 148, 152 (11th Cir. 1982). To

determine that a prosecutor committed misconduct in his or her argument to a jury

"(1) the remarks must be improper, and (2) the remarks must prejudicially affect

the substantial rights of the defendant." *United States v. Gonzales,* 122 F.3d 1383,

1389 (11th Cir. 1997) (quotation marks omitted).

Mr. Stratton testified in his defense. Ms. Thompson chose to remain silent.

During his argument to the jury, Mr. Stratton's lawyer commented as follows:

> By the way, Mr. Stratton testified under oath before you,
> just like every other witness and subjected himself to cross-
> examination just like every other witness.
> . . . .
> Joseph Stratton took the stand and told you he did not do
> what he is accused of. Does he have a personal interest in
> the outcome of the case? Absolutely. The government is
> going to tell you that he has a reason not to tell the truth.
> But if he's innocent, telling the truth works, too.
> . . . .
> He took the stand and testified in his own defense that he
> didn't do this. It's all you can do in a trial. They don't do
> trial by combat anymore. [H]e took the stand, subjected

26

himself to cross-examination and told you what his, his side of the story is.

In his rebuttal argument, the prosecutor responded to these comments as follows:

And don't reward the defendant for testifying in this case. While he has a right, she has a right to testify or not testify. There should be no reward for the fact that someone does take the stand. You're to assess the credibility of the defendant just as you are to assess the credibility of any other witnesses. The fact that they're willing to subject themselves to cross-examination, no reward for that.

Ms. Thompson's counsel immediately objected. He argued that the prosecutor's argument represented an impermissible comment on her decision not to testify. Ms. Thompson moved for a mistrial or, in the alternative, an instruction to the jury to disregard the prosecutor's remarks. The District Court denied both motions. Ms. Thompson renews this argument on appeal. We conclude that the prosecutor's remarks did not violate Ms. Thompson's Fifth Amendment right against self-incrimination.

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court declared that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615. "Although *Griffin* can be read to prohibit any direct reference to

27

a defendant's failure to testify," in subsequent decisions the Supreme Court "declined to adopt such a broad reading of *Griffin*." *United States v. Wing*, 104 F.3d 986, 990 (7th Cir. 1990).

In *Lakeside v. Oregon*, 435 U.S. 333 (1978), the defendant argued that his Fifth Amendment right against compulsory self-incrimination was violated when the trial court instructed the jury, over defense counsel's objection, that it could not draw an adverse inference from the defendant's refusal to testify. *Id.* at 336-38. Rejecting this argument, the Court explained that *Griffin* was "concerned only with adverse comment, whether by the prosecutor or the trial judge – 'comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.'" *Id.* at 338-39 (quoting *Griffin*, 380 U.S. at 615). Because the trial court had not asked the jury to draw an adverse inference from the defendant's failure to take the witness stand, the Court concluded that the defendant's privilege against compulsory self-incrimination was not violated. *Id.* at 339-341

The Supreme Court again declined to read *Griffin* broadly in *United States v. Robinson*, 485 U.S. 25, 31-32 (1987). In *Robinson*, the defendant's counsel complained to the jury in his closing argument that the Government had not given his client an opportunity to explain his actions. *Id.* at 28. On rebuttal, the

prosecutor responded that the defendant "could have taken the stand and explained it to you, anything he wanted to. The United States of America has given him, throughout, the opportunity to explain." *Id.* at 29. Concluding that the prosecutor's argument "was a clear violation of the defendant's constitutional right not to testify," the Sixth Circuit reversed the defendant's conviction. *United States v. Robinson*, 794 F.2d 1132, 1134-37 (6th Cir. 1986).

The Supreme Court reversed, holding that the prosecutor's comments did not violate the Fifth Amendment. *Robinson*, 485 U.S. at 31-32. The Court rejected the argument that "any 'direct' reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in *Griffin*." *Id.* at 31. Rather, the Court instructed that the *Griffin* rule only "prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Id.* at 32 (quotation marks omitted). The Court stressed that whether a prosecutor's comment on a defendant's refusal to testify violates the defendant's Fifth Amendment right against compulsory self-incrimination can be determined only by examining the context in which the statement was made. *Id.* at 31-33.[9]

---

[9]In *United States v. Frazier*, 944 F.2d 820 (11th Cir. 1991), this Court recognized that "the Supreme Court has limited the prohibitions placed upon the prosecutor's use of a

(continued...)

This Circuit applies the following standard in reviewing claims that a prosecutor's comments violated a defendant's Fifth Amendment right against compulsory self-incrimination:

> A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

*United States v. Knowles*, 66 F.3d 1146, 1162-63 (11th Cir. 1995) (quotation marks and citations omitted). Although this Court adopted this test in *United States v. Stuart-Cabellero*, 686 F.2d 890, 892 (11th Cir. 1982), before *Robinson* was decided, the standard is still appropriate, if read in light of the limitation in *Robinson* on the Supreme Court's holding in *Griffin*. Thus, in applying the *Stuart-Cabellero* test, we must determine whether a prosecutor's remarks were manifestly intended to urge the jury to draw an inference from the defendant's silence that he or she is guilty, or whether a jury would naturally and necessarily construe the prosecutor's remarks as inviting such an impermissible inference.

Ms. Thompson argues that the prosecutor indirectly invited the jury to draw an inference of guilt from her silence when he advised the jury that Mr. Stratton

---

[9](...continued)
defendant's silence at trial" in *Robinson*. *Id.* at 826.

30

should not be rewarded for testifying. She claims that in offering such direction to the jury, the prosecutor implied that there would be cases in which a defendant should be rewarded for testifying and thereby encouraged the jury to punish her for *not* testifying.

We disagree. The prosecutor in this case did not directly or indirectly encourage the jury to consider Ms. Thompson's decision to remain silent as evidence of her guilt. Rather, in response to the argument of Mr. Stratton's defense counsel, the prosecutor correctly informed the jury that a defendant should not be rewarded simply because he testifies and that a testifying defendant is not entitled to special credence as a witness simply because he subjected himself to cross-examination. The prosecutor's argument was clearly responsive to the argument of Mr. Stratton's counsel and was not intended in any respect to comment adversely on Ms. Thompson's decision to remain silent.

Nor did the prosecutor violate Ms. Thompson's constitutional rights by pointing out to the jury that Ms. Thompson had a right not to testify. The prosecutor's comment was made in the context of rebutting the argument of Mr. Stratton's attorney that his client should be given credit for testifying. Viewed in this context, we think that it is plain that the prosecutor did not intend to draw an adverse inference from Ms. Thompson's silence. Rather, the prosecutor was

31

discouraging the jury from drawing a positive inference in Mr. Stratton's favor simply because Mr. Stratton testified.

Finally, we note that the prosecutor's remarks in his closing argument were both legally correct and consistent with the District Court's jury instructions. The jury was instructed that a defendant has a right not to testify and that it could not draw an adverse inference from a defendant's failure to testify. The Court also admonished the jury that if a defendant does testify, it should assess his or her credibility in the same way that it did any other witness. Counsel for both defendants informed the court that they did not have any objections to this instruction.

Because the prosecutor's closing argument did not directly or indirectly encourage the jury to consider Ms. Thompson's silence as evidence of her guilt, Ms. Thompson's right against compulsory self-incrimination as construed in *Griffin* and *Robinson* was not violated. Accordingly, the District Court did not abuse its discretion in denying Ms. Thompson's motion for a mistrial or a curative instruction.

## VI

Ms. Thompson and Mr. Stratton argued in their opening briefs to this Court that, in light of *Blakely v. Washington*, 124 S. Ct. 2531 (2004), the District Court

32

committed reversible constitutional error by imposing sentences that had been enhanced on the basis of facts which they did not admit and which were not reflected in the jury's verdicts. After the appellants submitted their briefs, the Supreme Court decided *United States v. Booker*, 125 S. Ct. 738 (2005). In *Booker*, the Supreme Court

> held that *Blakely* applies to the federal Sentencing Guidelines and reaffirmed its *Apprendi* holding that, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

*United States v. Gallegos-Aguero*, 409 F.3d 1274, 1276 (11th Cir. 2005) (quotation marks omitted) (alteration in original). The Supreme Court in *Booker* redressed the Sentencing Guidelines' constitutional infirmity by excising those portions of the Sentencing Reform Act making the Guidelines mandatory. *Booker*, 125 S. Ct. at 764-68.

Because appellants did not raise a Sixth Amendment objection below, we review for plain error. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005); *Booker*, 125 S. Ct. at 125; Fed. R. Crim. P. 52(b). "An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." *Rodriguez*, 398

F.3d at 1298 (quotation marks omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation marks omitted). The Government concedes, and we agree, that both Appellants can show plain error in this case.

The jury convicted Ms. Thompson of conspiracy to possess with intent to distribute 500 grams or more of cocaine and 5 grams or more of cocaine base and two counts of possession with intent to distribute a detectable amount of cocaine base. Over Ms. Thompson's objection, the District Court found that Ms. Thompson was responsible for 500 grams of crack cocaine, which gave her a base offense level of 36. U.S.S.G. § 2D1.1(c)(2). The district court applied a two-level upward adjustment after finding – again, over Ms. Thompson's objection – that Ms. Thompson was an organizer, leader, manager, or supervisor under U.S.S.G. § 3B1.1(c). With Ms. Thompson's criminal history category of V, this resulted in a guideline range of 360 months to life. Absent the District Court's extra-verdict enhancements, the guideline range for Ms. Thompson's offenses would have been 110-137 months.

Because the District Court enhanced Ms. Thompson's sentence under a mandatory guideline system on the basis of factual findings not made by a jury or

admitted by Ms. Thompson, Ms. Thompson's Sixth Amendment rights were violated. *Rodriguez*, 398 F.3d at 1298. The error was plain because we apply the law as it exists "at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 468 (1997).

Mr. Stratton was convicted of conspiracy to distribute 500 grams or more of cocaine and five grams or more of cocaine base. The Presentence Report ("PSR") charged that Mr. Stratton was responsible for at least 1.5 kilograms of cocaine base, which would give Mr. Stratton a base offense level of 38. U.S.S.G § 2D1.1(c)(1). Over Mr. Stratton's objection, the District Court accepted the PSR's drug quantity determination. After applying a two-level upward adjustment for obstruction of justice, the District Court determined that Mr. Stratton's adjusted offense level was 40. Since Mr. Stratton did not have a criminal history, his guideline range was 292-365 months. If the District Court had not made extra-verdict enhancements, Mr. Stratton's guideline range would have been 63-78 months. For the same reasons we discussed with regard to Ms. Thompson's sentence, Mr. Stratton's sentence violated his Sixth Amendment rights, and the error was plain.

We also conclude that both Appellants have met their heavy burden of demonstrating that these sentencing errors affected their substantial rights in the

sense that the errors "affected the outcome of the district court proceedings."

*United States v. Cotton*, 535 U.S. 625, 632 (2002) (quotation marks omitted). At several points the District Court expressed its dissatisfaction with the sentence it was imposing on Ms. Thompson, noting that the sentence was "severe" and asking "whether this is really the kind of defendant Congress intended to be look at 360 months as a minimum." At the conclusion of Ms. Thompson's sentencing hearing, the District Court stated:

> The sentence I am going to impose is not a fair sentence in my view. The sentence that I have imposed already and will reduce on government's motion will make it even less fair. I think Ms. Thompson deserves to be in prison. I don't think she deserves to be imprisoned for 360 months. That's a choice Congress and the government has taken away from the Court.

When sentencing Mr. Stratton, the District Court expressed similar sentiments, announcing that it "continue[d] to have [the] same concerns or similar concerns with regard to the length of a sentence for a first offender." The District Court also stated that although the sentence it would impose would be substantial, it had "decided long ago not to fudge with the guidelines just to find a result that I find more palatable." Further, the District Court sentenced both Appellants to the low end of their respective guideline ranges. We are thus satisfied that "there is a reasonable probability" that both Appellants would have received a different

36

sentence "if the guidelines had been applied in an advisory instead of a binding fashion by the sentencing judge in this case." *Rodriguez*, 398 F.3d at 1301.

We also conclude that the sentencing errors in this case "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Shelton*, 400 F.3d 1325, 1333 (11th Cir. 2005) (quotation marks omitted). As the excerpts quoted above make clear, the District Court expressed its desire to impose a more lenient sentence on both Appellants than it was permitted under a mandatory guideline regime. Accordingly, the fourth prong of the plain error standard is satisfied in this case. *Id.* at 1334.

## CONCLUSION

We **AFFIRM** each judgment of conviction. We **VACATE** and **REMAND** both Appellants' sentences and remand to the District Court for resentencing.

TJOFLAT, specially concurring:

## I.

I concur in the court's judgment. I write separately because I disagree with the court's rationale for vacating appellants' sentences. The court vacates the sentences because, in the language of Rodriguez, "'there is a reasonable probability' that both Appellants would have received a different sentence 'if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case.'" Ante at ____ (quoting Rodriguez, 395 F.3d at 1301). In other words, the court is satisfied that appellants have satisfied the third element of the plain-error test; they have established prejudice—that the error "affects their substantial rights.'" Ante at ____ (quoting Rodriguez, 398 F.3d at 1298) (internal quotation marks omitted).

I do not fault the court for having required appellants to show such prejudice because Rodriguez is the law of this circuit. I submit that Rodriguez was wrong when decided and continues to be bad law. See United States v. Rodriguez, 406 F.3d 1261, 1281 (11th Cir. 2005) (Tjoflat, J. dissenting from the denial of rehearing en banc). As I have explained, "Booker constitutional error is

structural error." Id. at 1291.[1]  As such, it is "not subject to substantial-rights analysis...." Id. at 1292.

In deciding whether to vacate a defendant's sentence in a case of constitutional error, as we have here, Rodriguez and its progeny require us to examine the record (created, of course, under the pre-Booker sentencing model) for some indication that the district court would have imposed a lesser sentence had the law permitted it to treat the guidelines as advisory rather than mandatory. We look to what the court said prior to or in the course of imposing sentence.  We look for what I call "magic words."  In this case, the court finds them.  It discovered that "[a]t several points [during the sentencing hearing] the District Court expressed its dissatisfaction with the sentence it was imposing on Ms. Thompson, noting that the sentence was 'severe' and asking 'whether this is really the kind of defendant Congress intended to be look[ing] at 360 months as a minimum." Ante at ___.  The District Court continued, "I don't think she deserves to be imprisoned for 360 months." Ante at ___ (internal quotation marks omitted).

---

[1]  Booker established a new sentencing model, markedly and structurally different from the pre-Booker model under which appellants were sentenced.  I explained the difference between the two models in considerable detail in dissenting from the court's refusal to rehear Rodriguez en banc.  Rodriguez, 406 F.3d at 1286-91 (Tjoflat, J., dissenting from the denial of rehearing en banc).  Because the Booker model is materially different from the previous model, the effects of  Booker error "are necessarily unquantifiable and indeterminate." Id. at 1298 (quoting Sullivan v. Louisiana, 508 U.S. 275, 281-82, 113 S. Ct. 2078, 2083, 124 L. Ed. 2d 182 (1993)) (internal quotation marks omitted).

Subsequently, "[w]hen sentencing Mr. Stratton, the District Court expressed similar sentiments, announcing that it 'continue[d] to have [the] same concerns or similar concerns with regard to the length of a sentence of a first offender.' The District Court also stated that, although the sentence it would impose would be substantial, it had 'decided long ago not to fudge with the guidelines just to find a result that I find more palatable.'" Ante at ___. And so, finding these magic words, the court vacates appellants' sentences and remands the case for resentencing under the new Booker model.

## II.

The court's opinion illustrates one of many problems with the Rodriguez standard or, as I coin it, the "magic words" approach to plain-error review. Under Rodriguez, we do not generally reverse a sentence unless the district court has stated on the record that the guideline sentence is too high—and, by implication, unfair and unjust—that it would select a lower sentence if the law allowed it to do so, and that it is in general dissatisfied with the punishment provided for by democratically empowered lawmakers. That is, we vacate a sentence only where the judge has spoken some combination of these "magic words." Thus, at oral argument, if defense counsel begins a plain-error Booker argument, I immediately ask whether we will find any "magic words" in the record; if the answer is "no,"

40

then there is no reason for counsel to pursue the issue further.

A district judge who makes such comments may do so in the sincere belief that over time he or she, along with other like-minded judges, will persuade the Sentencing Commission or Congress to revise severe mandatory sentences. The judge may also think he or she is simply giving the defendant or his family a bit of encouragement. See, e.g., United States v. Ameline, 409 F.3d 1073, 1082 (9th Cir. 2005) (en banc) ("District court judges often make remarks at sentencing for purposes other than fact-finding. A district court judge may choose to say some encouraging words for the benefit of the defendant's family . . . ."). Or the judge may simply hope that the defendant will not hold a lengthy sentence against the judge personally. The least charitable view, however, is that the judge is just shooting the breeze and, in the process, doing the defendant and society a great disservice.

When a judge tells a defendant that his sentence is unjust and unfair, the defendant is inclined to believe him. The defendant is, therefore, unlikely to accept the justice of his punishment and "'enter the correctional system in a frame of mind that affords hope for success in rehabilitation over a shorter period of time than might otherwise be necessary.'" McKune v. Lile, 536 U.S. 24, 36-37, 122 S. Ct. 2017, 2026, 153 L. Ed. 2d 47 (2002) (quoting Brady v. United States, 397 U.S.

742, 753, 90 S. Ct. 1463, 1471, 25 L. Ed. 2d 747 (1970)); see also 18 U.S.C. § 3553(a)(2)(D) ("The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to provide the defendant with needed [rehabilitation] in the most effective manner . . . ."). The judge may also unwittingly encourage the defendant to persist in attacking his sentence on direct appeal and collateral review, notwithstanding that its substance and the manner of its imposition are legally correct. After all, why shouldn't the defendant appeal a sentence that even the judge criticized as too severe? Finally, by openly disparaging the defendant's sentence, the judge fosters disrespect for the rule of law. See 18 U.S.C. § 3553(a)(2)(A) ("The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to... promote respect for the law . . . ."). If the judge does not respect the law that he applies, then why should society at large? A judge's role is to apply the law as it is written, not to offer his or her own opinions of its wisdom or fairness. By his oath of office, the judge has sworn to uphold the law, including laws imposing mandatory sentences.[2]

---

[2] Such comments are quintessentially political statements. I do not suggest that there is never a time or place for them. The time and place for them, however, is outside the judicial role, in letters or testimony to the Sentencing Commission or Congress. When a judge makes such statements in specific cases and to specific defendants, the judge's potential for positive influence is not only greatly diminished, but is in fact far outweighed by the disservice done to

(continued...)

The Rodriguez rule encourages judges to continue opining on the record as to the fairness of sentences they impose in individual cases. Post-Booker, of course, there is no reason for judges to continue doing so in this precise context because the Guidelines are now advisory—if the judge thinks a guideline sentence is unfair, then he or she presumably will exercise the prerogative to not impose it. But Supreme Court precedents upholding mandatory minimums based on extra-verdict judicial findings and extra-verdict enhancements based on prior convictions are now thought by some to be in doubt. See Harris v. United States, 536 U.S. 545, 567-68, 122 S. Ct. 2406, 2419-20, 153 L. Ed. 2d 524 (2002) (mandatory minimums) (5-4 decision); Almendarez-Torres v. United States, 523 U.S. 224, 226-27, 118 S. Ct. 1219, 1222, 140 L. Ed. 2d 350 (1998) (5-4 decision).[3] Judges who are required to impose what they deem to be unfair or unjust sentences as the result of such laws are encouraged by Rodriguez to state their criticisms on

---

[2](...continued)
rule-of-law values, to the criminal justice system in general, and to the defendant in particular.

[3] In Shepard v. United States, _ U.S. _, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005), Justice Thomas, a member of the majority in the 5-4 Almendarez-Torres decision, wrote that "Almendarez-Torres . . . has been eroded by [the] Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that Almendarez-Torres was wrongly decided." Shepard, _ U.S. _, 125 S. Ct. at 1264 (Thomas, J., concurring) (citing, inter alia, Apprendi v. New Jersey, 530 U.S. 466, 520-21, 120 S. Ct. 2348, 2379, 147 L. Ed. 2d 435 (2000) (Thomas, J., concurring)). He further suggested that, "in an appropriate case, [the] Court should consider Almendarez-Torres' continuing viability" because "[i]nnumerable criminal defendants have been unconstitutionally sentenced under [its] flawed rule...." Shepard, _ U.S. _,125 S. Ct. at 1264 (Thomas, J., concurring).

43

the record.  Moreover, beyond these immediate issues, there will always be a possibility that some unanticipated ruling will, post-sentencing, call into question a sentence on a ground not advanced in the district court, thereby triggering Rodriguez's "magic words" requirement.  Thus, any time a judge is required to impose an "unjust" sentence, he should, according to Rodriguez, tell the defendant all about the injustice being done to him so that the defendant can receive the benefit of any subsequent appellate decisions.  Finally, even putting aside Rodriguez's impact on future sentencing hearings, I find it troubling that our decisions applying its standard appear to give past comments of this sort the imprimatur of this court.  The logical implication of our cases is that such statements are at least harmless—if not desirable—because we reward the defendant based on their presence in the record.

I add these additional thoughts on the Rodriguez standard after listening to a series of oral arguments in which the Booker/Rodriguez debate has consisted entirely of defense counsel arguing that the record does indeed contain some "magic words" and the Assistant U.S. Attorney responding that the words just aren't magical enough.  This process is as arbitrary as it is absurd.  A defendant is rewarded with a new sentencing hearing only if the sentencing judge took the entirely inappropriate step of publicly criticizing the law that required him to

impose the sentence. In contrast, a defendant whose sentence was imposed without gratuitous comment by the sentencing judge is denied a new hearing. "It [is] a mistake to infer from a district court's silence that the district court would not have made a different decision under a different sentencing scheme." Ameline, 409 F.3d at 1082. Silence often means nothing more than that an experienced judge understands his or her proper role in the criminal justice system. Thus, the judge's comments or silence inevitably turns out to be poor circumstantial evidence of what the judge would do if freed from the constraints imposed by the Guidelines.[4]

---

[4] As the Ninth Circuit observed,
District court judges often make remarks at sentencing for purposes other than fact-finding. A district court judge may choose to say some encouraging words for the benefit of the defendant's family; a district court judge may decide to lecture the defendant with a warning. District court judges have also been known to make stray comments about the Guidelines during sentencing, without necessarily intending for them to be interpreted as meaning that a different sentence would have been imposed under a discretionary sentencing scheme. It would be a mistake for us to attribute fresh meaning to comments made in an entirely different context. It would also be a mistake to infer from a district court's silence that the district court would not have made a different decision under a different sentencing scheme. In sum, in this unusual context, our ability to assess plain error based on the cold record is significantly impaired.
Ameline, 409 F.3d at 1082.