[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 4, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14808
Non-Argument Calendar

_____

D. C. Docket No. 06-00464-CR-T-17-TGW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JERMAINE LENARD MOSS,
TULANI JAMES COOPER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(August 4, 2008)**

Before BIRCH, DUBINA and FAY, Circuit Judges.

PER CURIAM:

Jermaine Lenard Moss and Tulani James Cooper, represented by separate counsel but appealing jointly following a joint jury trial,[1] appeal their convictions and sentences for drug-trafficking and firearm offenses. Specifically, Moss was convicted of, and sentenced to a total of 324 months' imprisonment for: (1) conspiracy to possess with intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) ("Count 1"); (2) conspiracy to use and carry firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(o) ("Count 2"); and (3) possession with intent to distribute 5 grams or more of crack cocaine on September 28, 2006, in violation of § 841(a)(1) ("Count 9"). Cooper was convicted of, and sentenced to a total of life plus 32 years' imprisonment, for (1) conspiracy to possess with intent to distribute 50 grams or more of crack cocaine, in violation of § 841(a)(1) ("Count 1"); (2) conspiracy to use and carry firearms during and in relation to a drug trafficking crime, in violation of § 924(o) ("Count 2");[2] (3) using a firearm during and in relation to a drug trafficking crime on June 13, 2006, in violation of 18 U.S.C. § 924(c) ("Count 3"); (4) aiding and abetting the possession with intent to distribute 50 grams or more of crack cocaine on July 26, 2006, in violation of

---

[1] Moss and Cooper were indicted along with eight others. They were joined at trial by co-indictee Robert Williams. Robert Williams elected, however, to appeal separately.

[2] All of the co-indictees were joined in Counts 1 and 2.

§ 841(a)(1) and 18 U.S.C. § 2 ("Count 4"); (5) using a firearm during and in relation to a drug trafficking crime on July 26, 2006, in violation of § 924(c) ("Count 5"); and (6) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) ("Count 6").

On appeal, Moss and/or Cooper argue that the district court (1) abused its discretion in denying Moss's and Cooper's objections to allowing evidence at trial of Cooper's shooting of a police officer during the execution of a search warrant on the residence from which they and their co-indictees dealt drugs; (2) erred in denying Moss's motion for a judgment of acquittal as to Counts 2 and 9 and Cooper's motion for a judgment of acquittal as to all counts;[3] (3) clearly erred in denying Moss's request for at least a minor-role reduction, pursuant to U.S.S.G. § 3B1.2; and (4) imposed an unreasonable sentences on Moss, by choosing a sentence that was greater than necessary given his minor role in the offense, and on Cooper, by choosing a sentence that was greater than necessary given that he did not deal drugs.  For the reasons discussed below, we affirm.

---

[3] The government argues on appeal that Moss did not argue adequately on appeal that his conviction under Count 9, for possessing with intent to distribute crack cocaine on September 28, 2006, was not supported by sufficient evidence.  We find, however, that Moss adequately challenged this conviction, albeit in a separate section from that in which he challenged his conviction under Count 2.  Accordingly, we will address this conviction below.

# I.

Before trial, Moss and Cooper submitted a motion in limine to prevent the government from presenting any evidence regarding the shooting of a police officer by Cooper during the execution of a search warrant on July 26, 2006. Moss and Cooper argued that this evidence was irrelevant to the charged crimes and unduly prejudicial. The district court denied the motion.

At trial, the government began its opening statement with:

> On the morning of July 26th of last year, 2006, . . . Sheriff's Deputy Todd Shear woke up, got ready to go to work, and little did he know that it wouldn't be the same day as it was for him every other day in his law enforcement career. He did not know that he was going to be shot that day.

The government's counsel then introduced himself and explained the following. The local county sheriff's office began investigating a group of people suspected of dealing crack cocaine from a certain house. Once it gathered, by way of "trash pulls," sufficient evidence of drug dealing and use of firearms within the house, it obtained a search warrant. Upon executing the search warrant, an officer was shot by Cooper.

Shear, the officer who was shot, then testified for the government that, on the day that the search warrant was executed, as he entered the southeast bedroom and turned toward the wall on the left side of the bedroom, he saw "Cooper lying

4

on the ground on his back with a firearm in his hand pointed at [Shear's] face." Cooper then shot at Shear, hitting Shear's left finger and the right side of his neck. Shear could see Cooper's face at the time of the shooting and was certain that it was Cooper who shot him. Because of the shooting, Shear had a permanent scar on his hand, bullet fragmentation in his neck that had yet to work its way out, and the "mental scar of [the] incident in [his] memory."

On cross-examination, Shear testified that, after he was shot, he spoke briefly at the hospital with a police officer who was conducting an internal affairs investigation of the shooting. At the time, Shear was under the influence of morphine. After Shear was released from the hospital, the investigating police officer re-interviewed him. At this time, he was not under the influence of medication. The investigating officer showed Shear a photograph lineup. From this lineup, Shear identified Cooper as the man who shot him.

Mary Wasilko, who lived next door to members of the conspiracy in a duplex, testified for the government that, on July 26, 2006, the day that the police planned to execute the aforementioned search warrant, they notified Wasilko that she and her daughters should leave their home. When Wasilko returned to her home on July 28, 2006, there were bullet holes in her daughter's bedroom door and in the hallway walls. The government submitted into evidence photographs of

5

these bullet holes.

Detective Richard Murray, a police officer with the local county sheriff's office, testified for the government that he conducted physical surveillance of, and "trash pulls" from, the duplex and another residence used by the co-indictees. The trash pulls yielded: (1) several plastic "sandwich bags," which Murray suspected from experience were used for storing crack cocaine for sale in small quantities and which field tests indicated had contained crack cocaine; (2) a drug ledger; (3) a box that had contained a digital scale, which Murray suspected from experience was used for weighing drugs; (4) an empty baking soda box, the contents of which Murray suspected from experience had been mixed with powder cocaine to make crack cocaine; (5) razor blades, which Murray suspected from experience were used to cut the crack cocaine into smaller pieces and which field tests indicated had been used on crack cocaine; and (6) empty ammunition boxes for high-powered or assault rifle.

Jarvis McCants, a co-indictee of Moss's and Cooper's, testified for the government that the distribution ring operated from the aforementioned residences. Inside the residences were crack cocaine, cocaine powder, firearms, and money. The firearms were used to protect the drugs and money. The government presented each of the firearms confiscated from the duplex, and McCants identified

each as either belonging to a member of the conspiracy or being kept in the duplex. The distribution ring used three cellular telephones for crack-cocaine orders. Customers would call, one of the co-conspirators would answer and take an order, and then the co-conspirator would meet the customer at a place outside the residence and deliver the crack cocaine.

Moss's job within the ring was answering the telephones, taking drug orders, and delivering drugs. McCants saw Moss with a firearm, specifically a chrome handgun, at the second residence. Also, one of the firearms kept at the residence, a pump-action shotgun, only could be used by Moss because he was a big man and the firearm could be used by a big man only. However, Moss never used it. Cooper did not live at the duplex and did not sell drugs. Rather, Cooper's job within the ring was "just protecting the house...the money and the drugs that [were] inside the house...with a gun or whatever." Indeed, McCants was with Cooper when he purchased a firearm from a "crack head." McCants later saw Cooper with the firearm at the duplex. The job of co-indictee Williams within the ring was supplying cocaine and cooking crack cocaine. The job of co-indictee Terry Eady was cooking crack cocaine. The job of co-indictee Chancey Cooper was using the aforementioned cellular telephones to sell crack cocaine.

McCants heard from a co-indictee that the duplex was robbed of money and

7

drugs totaling $35,000. McCants also heard that, after the robbery, co-indictees Trinidad Hamilton, Eady, Arnell Elrod, Chancey Cooper, and Cooper kidnaped, using firearms, a girl named Cierra whom they suspected was involved in the robbery. After McCants was arrested in connection with the conspiracy, he was placed in the county jail with Cooper. After approximately two months in jail, Cooper "confessed" to McCants and co-indictees Trinidad Hamilton, Maurice Hamilton, and Anthony Warrick that, on July 26, 2006, when the aforementioned search warrant was executed, Cooper had shot a police officer because he thought the robbers had returned. McCants admitted that he lied during a pre-trial interview with law enforcement, because he was trying to protect himself and his friends. Everything he testified to at the trial, however, was truthful.

On cross-examination, McCants admitted that the members of the conspiracy called themselves "the Fam" and that Cooper was not a part of the Fam. McCants hoped that the government would dismiss certain of his charges and recommend certain sentencing reductions and a sentence at the low of his guideline imprisonment range in return for his testimony.

Quentin Branch, who met and spoke with Moss and Cooper while in jail, testified for the government that, while in jail, Moss told Branch that Moss was involved in a drug ring. Moss stated he sold only "light" amounts of crack

cocaine, whereas others in the ring "sold heavy duty" amounts. Also while in jail, Cooper told Branch that Cooper was involved in a drug ring also, and that his job within the ring was providing "protection" for drugs and money. Cooper also told Branch that Cooper had shot a police officer when the police were executing a search warrant. On cross-examination, Branch admitted that, while the government had not promised him anything in exchange for testifying, he expected to "get something out of" testifying.

Richard Talbot, a police officer with the local county sheriff's office, testified for the government that he processed and photographed the duplex after the search warrant was executed and the officer was shot. He photographed a shotgun lying on the living room floor and a handgun lying on the living room couch. He also photographed clear plastic sandwich bags containing possible crack cocaine that were lying on a coffee table. He further photographed a safe located in a bedroom of the duplex and more clear plastic sandwich bags containing possible crack cocaine that were stored in the safe.

Michael Healy, a forensic chemist with the local sheriff's office, testified for the government that he analyzed the amounts of possible crack cocaine seized at the duplex pursuant to the search warrant. He found that the seized substances were crack cocaine and that one seized amount weighed 99.583 grams.

9

Randall Barnett, a detective with the local county sheriff's office, testified for the government that he was present on the day that the search warrant was executed. He was behind Shear as Shear entered the bedroom on the left of the duplex and ultimately was shot. After Shear was shot, Barnett and another officer fired rounds into the bedroom and then entered the bedroom. On cross-examination, Barnett admitted that he and the other officer fired rounds toward Elrod, believing from training and experience that he was the shooter.

Wendy Davis-Zarvis, a detective with the local county sheriff's office, testified for the government that she participated in a "buy bust" on September 28, 2006. Her role was to act as a customer seeking crack cocaine. She filmed the ultimate transaction with a camera hidden in the button hole of her shirt. Specifically, Davis-Zarvis made a call to a particular telephone number and indicated that she wished to buy approximately $300 worth of crack cocaine. The person who answered the telephone call agreed to meet Davis-Zarvis at a particular gas station and told Davis-Zarvis what type of car he would be driving. After approximately ten minutes, a car matching this description arrived at the gas station carrying three back males. Rather than get into the car, Davis-Zarvis chose to lean into the car on the front passenger side for safety reasons. Once she leaned into the car in this manner, she could see the driver of the car. The driver asked to

10

see Davis-Zarvis's money. When she showed him her "wad" of $300, he handed her what she believed was crack cocaine, and she handed him the money. The man who previously went into the store returned and the three men left.

Immediately after the transaction, Davis-Zarvis stated into her recording device that the driver was wearing a red shirt. Later, other officers stopped the car and arrested its passengers. At that time, the officers took photographs of the passengers. The government entered into evidence and played the videotape of the recording made from Davis-Zarvis's hidden camera. The videotape, however, did not show the driver exchanging crack cocaine for money because Davis-Zarvis was leaning on the front passenger seat and, therefore, blocking the view of the camera. The government also entered into evidence the photographs taken by the arresting officers. One of the photographs depicted a man wearing a red shirt. Davis-Zarvis identified this man as Moss and stated that she had "no doubt" that Moss was the man who sold her crack cocaine. Davis-Zarvis also identified the man who entered the store as Chancey Cooper.

Healy, the forensics chemist, testified for the government that he analyzed the amounts of possible crack cocaine seized pursuant to the buy bust. He found that the seized substances were crack cocaine and that one seized amount weighed

11

8.345 grams. [4]

Cierra Williams testified for the government that she visited the duplex, with her aunt, brother, and a friend, on June 12, 2006, to purchase cocaine. Later that night, Trinidad Hamilton called her to tell her that the duplex had been robbed and that he believed that Williams's brother and friend were involved. He indicated that he wanted Williams to disclose her brother's and friend's whereabouts. She refused. In the early morning on June 13, 2006, Trinidad Hamilton, Chancey Cooper, Elrod, Eady, and Cooper came to Williams's house. Each man carried a firearm, save Eady. They demanded that Williams tell them her brother's and friend's whereabouts. When she refused, Trinidad Hamilton "grabbed [her] arm" and "snatched [her] out the door." Williams was put in a car, and the car doors were locked. Some of men pointed firearms at her. Cooper demanded that Williams tell him her brother's and friend's whereabouts and said, "I don't care, I've killed bitches before, I'll kill you, too." Accordingly, Williams took them to see her friend.

During the conversation that ensued, some of the men pointed firearms at Williams and her friend. At some point during the conversation, Cooper "hit

---

[4] The following testimony actually was given during Healy's earlier testimony for the government. For the sake of clarity, however, we have separated the following testimony so that it is in context.

[Williams] with the gun on [her] cheek." Eventually, the men left. When she returned home, Williams called the police and reported the incident. She did not disclose the names of each of the perpetrators, as Williams's sister had a baby with Eady and Williams herself had been pregnant with Trinidad Hamilton's baby. In a written affidavit, however, she did identify Cooper by his nickname, "T London," as a perpetrator in a written affidavit.

Annjanet Jackson, Williams's sister, testified for the government that she was with her sister on the early morning of June 13 when Trinidad Hamilton, Chancey Cooper, Elrod, Eady, and Cooper came to Williams's house. Each of the men was armed, save Eady. (Id. at 151). The men, however, did not point the firearms at Williams' face at that point. Rather, they just carried the firearms. Jackson witnessed the men take Williams to a car, but Jackson did not leave with them. On cross-examination, Jackson admitted that she hoped that Eady would receive credit for her providing testimony.

Rusty Simmons, the friend who accompanied Williams to the duplex, testified for the government that, on the early morning of June 13, 2006, while Simmons was at home, he received a call from Williams, who was crying and saying that Simmons needed to come outside and that it was an "emergency." As soon as he stepped outside in compliance with her request, he "got rushed" by a

13

group of men. The men had firearms and questioned Williams about the robbery of the duplex. They pointed their firearms at Simmons.

Chancey Cooper, who was Cooper's cousin and a co-indictee of Moss's and Cooper's, testified for the government that Cooper did not sell drugs, but just lived at the duplex because he had nowhere else to go. Moss used the cellular telephones to sell small quantities of crack cocaine. Chancey Cooper was with Moss on September 28, 2006. Moss drove the car to a gas station with the intent to sell drugs to the undercover officer.

On cross-examination, Chancey Cooper stated, when asked if Cooper was the "muscle of the organization," that "everybody had guns" and "[e]verybody was protecting the house." When asked if protecting the house was Cooper's job, Chancey Cooper stated that "[i]t was everybody's job to protect the house." Chancey Cooper admitted that he was hoping to "get something" in return for testifying. On redirect examination, Chancey Cooper stated that he had pled guilty for his part in the conspiracy by way of a written plea and that, in the plea agreement, he had agreed that Cooper was an "armed enforcer or muscle to protect the drug trafficking activities."

Bobby Lewis, a detective with the local county sheriff's office whose job was investigating shootings by and of police officers, testified for Cooper that he

14

interviewed Shear at the hospital immediately following Shear's shooting. While Shear seemed to be in pain at the time, he appeared to have "all his faculties about him." Lewis asked Shear if Shear could identify the man who shot him. Shear responded that the shooter was a "black male that he couldn't specifically identify at [that time.]" Shear also responded that, "with the speed of the events[,] he did not get a good look at the black male with the gun." Shear stated, however, that the "image of [the shooter was] burned into his mind" and that he would "never forget [his] face[]." Lewis then showed Shear a photograph spread containing five photographs and asked Shear if one of the photographs was of Shear's shooter. Shear pointed to Cooper and stated that Cooper "could be the shooter."

On cross-examination, Lewis stated that, upon seeing the photograph spread, Shear pointed to Cooper and said Cooper was the shooter without hesitation. When Lewis later re-interviewed Shear, Lewis again sought to show Shear a photograph spread. Before Shear even could spread out all of the photographs, however, Shear picked up the photograph of Cooper and again identified Cooper as the shooter.

After hearing this, and other evidence, the jury found Moss and Cooper guilty of all charges. Moss and Cooper both filed motions for judgments of acquittal and new trials, pursuant to Fed.R.Crim.P. 29 and Fed.R.Crim.P. 33,

15

arguing that the evidence was insufficient to support their convictions. The district court denied the motions.

Before Moss's and Cooper's sentencing, a probation officer prepared presentence investigation reports. Therein, the probation officer set Moss's total offense level at 40 and criminal history category at II. Accordingly, Moss's guideline imprisonment range was 324 to 405 months. The probation officer noted that Count 1 carried a statutory term of 20 years' to life imprisonment, pursuant to 21 U.S.C. § 841(b)(1)(A); Count 2 carried a statutory term of 0 to 20 years' imprisonment, pursuant to § 924(o); and Count 9 carried a statutory term of 10 years' to life imprisonment, pursuant to 21 U.S.C. § (b)(1)(B).

The probation officer set Cooper's total offense level at 44 and criminal history category at VI. Regarding Cooper's criminal history category, the probation officer explained that Cooper was an armed career criminal, pursuant to U.S.S.G. § 4B1.4, and that he had been convicted of two counts of attempted murder when he was 15 years old, after he shot two women, one in her right arm and one in her neck and back, during a drug transaction. Accordingly, Cooper's guideline sentence was life imprisonment. The probation officer noted that Counts 1 and 4 carried a statutory term of 20 years' to life imprisonment, pursuant to § 841(a)(1) and 21 U.S.C. § (b)(1)(A)(iii); Count 2 carried a statutory term of 0 to

16

20 years' imprisonment, pursuant to § 924(o); Count 3 carried a statutory mandatory term of 7 consecutive years' imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A)(ii); Count 5 carried a statutory mandatory term of 25 consecutive years' imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii); and Count 6 carried a statutory term of 15 years' to life imprisonment, pursuant to § 922(g)(1) and 18 U.S.C. § 924(a)(2) and (e)(1).

At Moss's sentencing hearing, he argued that he deserved at least a minor-role reduction because he was not a "big player" or even an "average participant" in the conspiracy. His participation was similar to that of McCants, who only helped cut and distribute the crack cocaine, and that McCants received a mitigating-role reduction.

Moss also argued that the guideline imprisonment range was greater than necessary and requested a sentence of 20 years' imprisonment, or the statutory minimum mandatory. Moss's family members spoke in support of Moss. The government requested a sentence in the middle of the guideline imprisonment range, or 360 months, to reflect the serious nature of the offense and the serious nature of Moss's participation in the offense and to protect the public from Moss.

The district court impliedly overruled Moss's mitigating-role objection. The district court stated that it had reviewed the parties' arguments and the factors set

17

out in 18 U.S.C. § 3553(a) and noted that Moss was a danger to the community. The district court sentenced Moss to 324 months' imprisonment as to Counts 1 and 9 and 240 months' imprisonment as to Count 2, with all terms to be served concurrently. The district court concluded that this sentence was sufficient but not greater than necessary. (Id. at 39).

At Cooper's sentencing hearing, Dr. Sidney J. Merin, a psychologist, testified that he met with Cooper for several hours and conducted several psychological exams. He found that Cooper had had a traumatic youth, as his father was abusive and his mother was a drug addict. He also found that, because of this traumatic youth and a lack of direction from his parents, Cooper never learned to react appropriately or to "think things through" and became, instead, very "action oriented." On cross-examination, Merin stated that Cooper was a danger to the public. Cooper asked that the district court be lenient, given his upbringing, and that the district court recommend that Cooper receive counseling while incarcerated. Cooper also reminded the district court that he could be "habilitated . . . to live in society." Cooper requested a sentence of the statutory minimum mandatories. The government responded that Cooper was a threat to society and requested a sentence of life imprisonment plus consecutive sentences of 7 and 25 years' imprisonment.

18

The district court acknowledged that it had heard and understood the parties' arguments and the factors set out in § 3553(a) and noted that Cooper was a "dangerous man" and a danger to the community. The district court also noted that it could not ignore that Cooper previously had shot two women and stated that it would fail in its responsibilities if it let Cooper "be out among the rest of the community." The district court sentenced Cooper to life imprisonment as to Counts 1, 4, and 6, with each of these terms to be served concurrently; 20 years' imprisonment as to Count 2, with this term to be served concurrently to the previous terms; 7 years' imprisonment as to Count 3, with this term to be served consecutively to all others; and 25 years' imprisonment as to Count 5, with this term to be served consecutively to all others. The district court also recommended that Cooper receive drug treatment and counseling while incarcerated. The district court concluded that these sentences were reasonable and adequate.

## II.

### a. Evidence of officer's shooting

We review the district court's evidentiary rulings for clear abuse of discretion and will reverse the district court's rulings only if the resulting error affected the defendant's substantial rights. United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003). A trial judge has broad discretion to admit evidence under

the Federal Rules of Evidence. <u>United States v. Madera</u>, 574 F.2d 1320, 1322 (11th cir. 1978).

Fed.R.Evid. 401 defines "relevant" evidence as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under this rule, evidence need not be conclusive of a material issue in order to be relevant and admissible. <u>Id.</u> Pursuant to Fed.R.Evid. 402 and 403, "all relevant evidence is admissible," unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentations of cumulative evidence." In reviewing whether evidence is properly admitted under these rules, we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." <u>Dodds</u>, 347 F.3d at 897. Indeed, we have held that these rules carry a "strong presumption in favor of admissibility" and that exclusion for undue prejudice under Fed.R.Evid. 403 is an "extraordinary remedy," whose "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." <u>United States v. Grant</u>, 256 F.3d 1146, 1155 (11th Cir. 2001).

Regarding a defendant's argument that the admission of evidence pertaining to his codefendant at a joint trial affects his substantial rights, we have "long recognized that a defendant does not suffer compelling prejudice simply because much of the evidence admitted at trial is applicable only to codefendants," even where the evidence in question "may not have been relevant to the charges brought against" that defendant. United States v. Garcia, 405 F.3d 1260, 1272 (11th Cir. 2005) (affirming a defendant's conviction for conspiracy to manufacture and possess with intent to distribute 100 or more marijuana plants over his argument that the admission of photographs of marijuana plants and other evidence that solely concerned his codefendant was irrelevant to his charged offense and, therefore, unduly prejudicial). Thus, when the challenged evidence is clearly relevant to the charges brought against a defendant's codefendants, the district court does not abuse its discretion in admitting it at a joint trial. Id.

The district court did not abuse its discretion in admitting the evidence, both as to Moss and Cooper. See Dodds, 347 F.3d at 897. Cooper was charged in the indictment with using a firearm during and in relation to a drug trafficking crime on July 26, 2006, the date the search warrant was executed. The testimony of Shear and other law enforcement officers regarding Shear's shooting on that day definitely had a tendency to make Cooper's guilt of this charge more probable,

such that it was relevant. See Fed.R.Evid. 401. Indeed, the government may have been hard pressed to prove his guilt absent Shear's testimony, as Shear provided the only eyewitness identification of Cooper as the shooter. Therefore, the evidence was not a "matter of scant or cumulative probative force." The "extraordinary remedy" of exclusion under Fed.R.Evid. 403 was not warranted. See Grant, 256 F.3d at 1155.

The testimony of Wasilko, the neighbor in the duplex, presents a closer question. Wasilko did not witness Shear's shooting and her contribution to the trial, with regard to this matter, largely was limited to describing the bullet holes she found in her daughter's bedroom wall days after Shear's shooting and serving as a vehicle by which the government could submit photographs of these bullet holes into evidence. Because this evidence did not tend to make the fact of Cooper shooting Shear more or less probable, and likely put in the jury's minds an idea that Cooper could have killed Wasilko's daughter had Wasilko and her daughters been home, it is arguable that the probative value of the evidence was outweighed by its prejudicial affect. See Fed.R.Evid. 403. However, even were this the case, Wasilko's testimony does not appear to have affected Cooper's substantial rights. See Dodds, 347 F.3d at 897 (holding that we review the district court's evidentiary rulings for clear abuse of discretion and will reverse the district court's rulings only

22

if the resulting error affected the defendant's substantial rights). Given that Shear positively identified Cooper as his shooter, at the hospital immediately after the shooting, later at his home, and in court, the jury had ample evidence on which to convict Cooper of the charge in question. Therefore, it is unlikely that the jury convicted Cooper of this charge simply because it was angered at the possibility of Wasilko's daughter also being harmed.

Because the testimony of Shear and the other law enforcement officers was relevant to the charges against Cooper, Moss's argument that it should have been excluded because it unduly prejudiced him is without merit. See Garcia, 405 F.3d at 1272. Moreover, this evidence arguably was relevant as to Moss also. See Fed.R.Evid. 401. Moss was charged in the indictment with conspiracy to use firearms in the course of drug trafficking. This evidence, coupled with McCants's testimony that Cooper confessed that he shot Shear because he thought the robbers had returned, arguably tended to make Moss's guilt of this charge more probable, as it showed that one of Moss's alleged co-conspirators used a firearm to protect the drugs and money in the house. See Fed.R.Evid. 401. While Wasilko's testimony presents a closer question, given its arguable lack of relevance to Cooper's charges, this testimony does not appear to have affected Moss's substantial rights. See Dodds, 347 F.3d at 897. As discussed below, the jury heard

23

ample evidence on which to base its convictions of Moss, such that it is unlikely that the jury convicted Moss simply because he was an acquaintance of a man who may have fired shots into Wasilko's half of the duplex. For these reasons, the district court did not clearly abuse its discretion in admitting evidence of the shooting. See Dodds, 347 F.3d at 897.

### b. Sufficiency of the evidence

We review de novo whether sufficient evidence supports a conviction. United States v. Gunn, 369 F.3d 1229, 1234 (11th Cir. 2004). In conducting our review, we view the evidence in the light most favorable to the government and reverse only if no reasonable trier of fact could have found guilt beyond a reasonable doubt. Id. Regarding witness testimony, "[i]t is well established that [c]redibility determinations are the exclusive province of the jury" and will be reversed only if the testimony was "incredible as a matter of law." United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997).

To convict a defendant of possession with intent to distribute drugs, the government must prove that the defendant (1) knowingly and willfully, (2) possessed drugs, and (3) intended to distribute these drugs. United States v. Poole, 878 F.2d 1389, 1391-92 (11th Cir. 1989). The government may prove each of these elements by either direct or circumstantial evidence. Id. Specifically

24

regarding the intent-to-distribute element, evidence such as the quantity of cocaine and the existence of implements such as scales commonly used in connection with the distribution of cocaine is sufficient. Id.

To convict a defendant of conspiracy to possess with intent to distribute drugs, the government must prove that (1) an illegal agreement existed to possess with the intent to distribute cocaine, (2) the defendant knew of this agreement, and (3) the defendant knowingly and voluntarily joined the agreement. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). Specifically regarding the agreement element, we have recognized that "there is rarely any direct evidence of an agreement to join a criminal conspiracy" and have held, therefore, that "a defendant's assent can be inferred from acts furthering the conspiracy's purpose." United States v. Gianni, 678 F.2d 956, 959 (11th. Cir. 1982). We likewise have held that the government "is not required to prove knowledge of all the details of the conspiracy on each of its members, provided a defendant's knowledge of the essentials of the conspiracy is established." Id.

To convict a defendant of aiding and abetting the possession with intent to distribute drugs, the government must prove that (1) the substantive offense was committed by someone, (2) the defendant committed an act that contributed to and furthered the offense, and (3) the defendant intended to aid in its commission.

25

United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000).

To convict a defendant of possession of a firearm during and in relation to a drug trafficking offense, the government must prove that (1) during and in relation to a drug-related conspiracy, (2) the defendant used, carried, or possessed a firearm, (3) in furtherance of that conspiracy. Gunn, 369 F.3d at 1234. Specifically regarding the in-furtherance-of element, the government must establish that the firearm had "some purpose or effect with respect to the drug trafficking crime," or that the firearm "facilitate[d], or ha[d] the potential of facilitating, the drug trafficking offense." United States v. Frye, 402 F.3d 1123, 1128 (11th Cir. 2005).

To convict a defendant of conspiracy to possess a firearm during and in relation to a drug trafficking offense, the government must prove that (1) a conspiracy existed to commit the substantive offense, (2) the defendant knew of it, and (3) the defendant, with knowledge, voluntarily joined it. See United States v. Thompson, 422 F.3d 1285, 1290 (11th Cir.2005) (describing the elements of a general conspiracy charge).

To convict a defendant of possession of a firearm by a convicted felon, the government must show that (1) the defendant knowingly possessed a firearm or ammunition, (2) he previously was convicted of an offense punishable by a term of

imprisonment exceeding one year, and (3) the firearm or ammunition was in or affecting interstate commerce. United States v. Palma, 511 F.3d 1311, 1315 (11th Cir. 2008).

Sufficient evidence supported Moss's and Cooper's convictions. See Gunn, 369 F.3d at 1234. Regarding Moss's convictions, the government adequately demonstrated that Moss conspired to use firearms in the course of a drug-trafficking offense. See id. The government was required to show that a conspiracy existed to use, carry, or possess firearms in the course of a drug-related conspiracy and in furtherance of that conspiracy, that Moss knew of the conspiracy, and that Moss knowingly joined that conspiracy. See id.; Thompson, 422 F.3d 1285 at 1290. At trial, Officer Talbot testified that, upon processing the duplex on July 26, 2006, he photographed firearms lying around the duplex. From this testimony, it was evident that members of the conspiracy kept firearms. See Gunn, 369 F.3d at 1234. Also, McCants testified that the members of the conspiracy used guns to protect the drugs and money within the duplex, and Chancey Cooper testified in reference to the members of the conspiracy that "everybody had guns" and "[e]verybody was protecting the house." Likewise, Williams, Jackson, and Simmons testified that all but one of the men who came to Williams's and Simmons's homes on June 13, 2006, carried firearms and that

27

certain of these men pointed their firearms at Williams and Simmons. Although the witnesses did not identify Moss as one of the men who came to the homes on June 13, 2006, from this testimony, the jury could have concluded that the members of the conspiracy had at least a tacit agreement to possess firearms and that this possession was meant to facilitate the object of the conspiracy by safeguarding the product and profit of the conspiracy from robbery. See Thompson, 422 F.3d at 1290; Frye, 402 F.3d at 1128; Gunn, 369 F.3d at 1234. The jury also could have concluded that Moss knew of the conspiracy because he was one of the members of the drug conspiracy, as discussed below, and, therefore, fell within the "everybody" mentioned by Chancey Cooper. See Thompson, 422 F.3d at 1290.

Finally, McCants testified that he saw Moss with a handgun at the duplex. From this testimony, the jury could have determined that Moss knowingly joined the conspiracy to possess firearms to protect the drugs and money within the duplex by actually possessing a firearm within the duplex himself. See Thompson, 422 F.3d at 1290. While the jury could have decided that Moss's possession of the firearm at that time was not "in furtherance of" the conspiracy, it was not unreasonable for the jury to decide otherwise. See Gunn, 369 F.3d at 1234.

The government also adequately demonstrated that Moss possessed with

28

intent to distribute five grams or more of crack cocaine on September 28, 2006.

See id. The government was required to show that Moss knowingly possessed

crack cocaine and intended to sell it. See Poole, 878 F.2d at 1391-92. At trial,

Officer Davis-Zarvis described the buy bust of September 28, 2006, and identified

Moss as the man who sold her the crack cocaine in question. Also, Chancey

Cooper testified that he was with Moss during the buy bust and that Moss drove

the car, carried crack cocaine with him, and intended to sell the crack cocaine to

Davis-Zarvis. From this testimony, the jury could have concluded that Moss

possessed with intent to distribute crack cocaine on September 28, 2006. See id.

Furthermore, Healy testified that the crack cocaine seized from Moss and the

others after they were arrested following the buy bust weighed more than 5 grams.

From this testimony, the jury could have determined that Moss possessed with

intent to distribute more than five grams of crack cocaine on that day.

Regarding Cooper's convictions, the government adequately demonstrated

that Cooper conspired to possess with intent to distribute drugs. See Gunn, 369

F.3d at 1234. The government was required to show that a conspiracy existed to

possess with intent to distribute crack cocaine, that Cooper knew of this

conspiracy, and that Cooper joined the conspiracy by acting in furtherance of the

conspiracy. See Charles, 313 F.3d at 1284; Gianni, 678 F.2d at 959. At trial,

29

McCants testified that the co-indictees used cellular telephones to take orders for crack cocaine and delivered the crack cocaine ordered. From this testimony, the jury could have concluded that the co-indictees had an agreement to sell crack cocaine. See Charles, 313 F.3d at 1284.

Likewise, McCants testified that Cooper's job within the drug-trafficking conspiracy was protecting the house and its contents with guns, and Chancey Cooper testified in response to a question regarding Cooper's participation in the conspiracy that "everybody had guns" and "[e]verybody was protecting the house." Indeed, McCants testified that he was with Cooper when Cooper purchased a firearm and later saw Cooper with the firearm at the duplex, and Chancey Cooper admitted that he agreed in his written plea agreement that Cooper was an "armed enforcer" for the conspiracy. From this testimony, the jury had reason to decide that Cooper joined the drug-trafficking conspiracy. See id. Although the testimony did not describe Cooper stating that he would join the conspiracy as an enforcer, his act of buying a firearm and possessing the firearm while at the duplex constituted evidence of acts done in furtherance of the conspiracy and, therefore, constituted evidence of agreement. See Gianni, 678 F.2d at 959.

The government also adequately demonstrated that Cooper conspired to use firearms in furtherance of the drug-trafficking conspiracy. See Gunn, 369 F.3d at

30

1234. The government was required to show that a conspiracy existed to use, carry, or possess firearms in the course of a drug-related conspiracy and in furtherance of that conspiracy, that Cooper knew of the conspiracy, and that Cooper knowingly joined that conspiracy. See id.; Thompson, 422 F.3d 1285 at 1290. As discussed above, with regard to Moss's convictions, the government presented testimony from which the jury could have concluded that the members of the conspiracy had at least a tacit agreement to possess firearms and that this possession was meant to facilitate the object of the conspiracy by safeguarding the product and profit of the conspiracy from robbery. See Thompson, 422 F.3d at 1290; Frye, 402 F.3d at 1128; Gunn, 369 F.3d at 1234.

Also, at trial, in response to a question regarding Cooper's role within the conspiracy, Chancey Cooper testified that "everbody had guns" and "[e]verbody was protecting the house." From this testimony, the jury could have concluded that Cooper knew of the conspiracy to use firearms to protect the drugs and money within the duplex because he was present at the duplex while "everyone" possessed firearms with that purpose in mind. See Thompson, 422 F.3d at 1290. Likewise, Williams, Jackson, and Simmons testified that, when Cooper and others arrived at Williams's and Simmons's homes on June 13, 2006, all but one of the men, including Cooper, were armed with firearms and that the purpose of their visit was

31

to ascertain who had robbed the duplex of drugs and money. From this testimony, the jury could have concluded that Cooper joined the conspiracy by carrying a firearm for the purpose of furthering the conspiracy's goals of selling crack cocaine and earning money. See id.

The government also adequately demonstrated that Cooper used a firearm in furtherance of the drug-trafficking conspiracy on June 13, 2006. See Gunn, 369 F.3d at 1234. The government was required to show that Cooper used, carried, or possessed a firearm during and in relation to a drug-trafficking offense with the intent to facilitate that offense. See id. At trial, Williams testified that, on June 13, 2006, Cooper and others came to her house and were armed. Also, Williams testified that, eventually, Cooper hit her on the cheek with his gun. From this testimony, the jury could have concluded that Cooper possessed and used a firearm on that date. See id.

Likewise, Williams testified that the men who came to her house demanded that she tell them the whereabouts of her brother and friend because they suspected that her brother and friend had been involved in robbing the duplex of drugs and money, and that Cooper specifically stated that Williams should tell them the whereabouts of her brother and friend or else he might kill her. From this testimony, the jury could have concluded that Cooper possessed and used the

firearm in furtherance of the drug-trafficking conspiracy, or in an effort to determine who had robbed the conspirators of their product and profit. See id. Although Williams did not identify all of the men in reporting the incident to the police, because she had personal connections with two of these men, she did identify Cooper by his nickname, T London, as one of the men. Therefore, it was not unreasonable for the jury to credit her testimony. See Calderon, 127 F.3d at 1325.

The government also adequately demonstrated that Cooper aided and abetted the possession with intent to distribute 50 grams or more of crack cocaine on July 26, 2006. See id. The government was required to show that members of the conspiracy knowingly and willfully possessed crack cocaine on that day and that the existence of implements common to drug selling were present that day, that Cooper committed an act that contributed to the goal of the possession offense, and that Cooper intended his act to further the goal of the possession offense. See Camacho, 233 F.3d at 1317; Poole, 878 F.2d at 1391-92. At trial, Healy, the forensics chemist, testified that crack cocaine weighing more than 50 grams was seized from the duplex pursuant to the search warrant; Officer Talbot testified that he photographed clear plastic sandwich bags containing suspected crack cocaine in the duplex upon processing the duplex on the day of the search warrant execution;

33

and Detective Murray testified that, in his experience, clear plastic bags were used to store crack cocaine for sale in small quantities. From this testimony, the jury could have concluded that people within the duplex possessed with intent to distribute 50 grams or more of crack cocaine. See id.

Also, Shear testified that, as he was securing the duplex so that it could be searched, Cooper shot him with the firearm. Likewise, Branch testified that, while in jail, Cooper confessed to him that he shot Shear on that day, and McCants testified that, while in jail, Cooper confessed to hm that he did so because he feared that the robbers had returned. From this testimony, the jury could have concluded that Cooper shot Shear in an effort to protect the guns and money within the duplex from robbery, or committed an act in furtherance of the conspiracy's goals of selling crack cocaine and earning money with the intent to aiding the conspiracy in this manner. See id.

The government also adequately demonstrated that Cooper used a firearm in furtherance of the drug-trafficking conspiracy on July 26, 2006. See Gunn, 369 F.3d at 1234. The government was required to show that Cooper used, carried, or possessed a firearm during and in relation to a drug-trafficking offense with the intent to facilitate that offense. See id. At trial, Shear testified that Cooper shot him on July 26, 2006. Also, Lewis testified that Shear identified Cooper from a

34

photograph spread as the man who shot him both immediately after the shooting at the hospital and later at Cooper's home. Indeed, Lewis testified that Shear identified Cooper from the second photograph spread before Lewis even could line up all of the photographs. Likewise, Branch testified that, while in jail, Cooper admitted to him that he had shot Shear that day. From this testimony, the jury could have concluded that Cooper used a firearm on July 26, 2006. See id. While Barnett testified that he and other officers originally believed, from training and experience, that Elrod was the shooter, he did not indicate that he saw Elrod shoot Shear. Indeed, even if he had testified as such, it would not have been unreasonable for the jury to credit Shear's multiple identifications and the testimony of Cooper's confession, over Barnett's testimony. See Calderon, 127 F.3d at 1325. Furthermore, McCants testified that, while in jail, Cooper admitted to him that he shot Shear that day because he suspected that the robbers had returned. From this testimony, the jury could have determined that Cooper shot Shear with the intent to facilitate the conspiracy's goals by protecting the conspiracy's product and profit. See Gunn, 369 F.3d at 1234.

Finally, the government also adequately demonstrated that Cooper possessed a firearm after being convicted of a felony. See id. The government was required to show that Cooper knowingly possessed a firearm that was traded in interstate

35

commerce after he was convicted of an offense punishable by a term of imprisonment exceeding one year. See Palma, 511 F.3d at 1315. The only of these elements at issue is whether Cooper possessed a firearm. See id. As discussed above, the government presented testimony from which the jury could have concluded that Cooper possessed a firearm on July 26, 2006. From this testimony, the jury also could have concluded that Cooper was a felon in possession of a firearm on that day. See id. For these reasons, the district court did not err in denying Moss's and Cooper's motions for judgments of acquittal and new trials, as sufficient evidence supported their convictions. See Gunn, 369 F.3d at 1234.

### c. Minor-role reduction

We review the district court's finding concerning the defendant's role in the offense for clear error. United States v. DeVaron, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). The defendant bears the burden of proving that he deserves a mitigating-role reduction by a preponderance of the evidence. United States v. Boyd, 291 F.3d 1274, 1277 (11th Cir. 2002).

According to U.S.S.G. § 3B1.2, a district court may decrease a defendant's offense level by two levels if it finds the defendant was a "minor participant" in the criminal activity. A "minor participant" is a defendant "who is less culpable than

36

most other participants, but whose role could not be described as minimal." Id. at comment. (n.5).

We established a two-pronged approach for determining whether a minor-role reduction is warranted. DeVaron, 175 F.3d at 940. First, "[o]nly if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable-not a minor role in any larger criminal conspiracy-should the district court grant a downward adjustment for minor role in the offense." Id. at 944. The purpose behind this downward adjustment is to curtail the risk that, "given the relatively broad definition of relevant conduct under [U.S.S.G.] § 1B1.3, some defendants may be held accountable for conduct that is much broader than their specific acts." Id. at 941. Second, "the district court may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct." Id. at 940, 944. We outlined two limiting principles that control this comparison: "First, the district court should look to other participants only to the extent that they are identifiable or discernable from the evidence. This is a fact-intensive inquiry. Second, the district court may consider only those participants who were involved in the relevant conduct attributed to the defendant." Id. at 944. We held that the defendant must be less culpable than most other participants in his relative conduct

37

and recognized the possibility that no participant played a minor role.  Id.

The district court did not clearly err in denying a minor-role reduction.  See DeVaron, 175 F.3d at 937.  The conduct for which Moss was held accountable was conspiring to possess with intent to distribute crack cocaine and conspiracy to use firearms in furtherance of the crack-cocaine conspiracy.  Each of his co-indictees also was held accountable for this conduct.  With respect to the first prong of the DeVaron analysis, the testimony at trial suggested that Moss's role within the drug-trafficking conspiracy was answering the cellular telephones, taking orders for crack cocaine, and delivering the crack cocaine ordered, as well as using firearms to protect the house and its contents.  See id.  Given that Moss's role  was integral to the conspiracy to selling crack cocaine, in that he was one of the people doing the actual selling, he was not held accountable for conduct that was broader than his actual conduct.  See id.

With respect to the second prong of the DeVaron analysis, the testimony at trial suggested that, save for Williams, Eady, and Cooper, all six of the others indicted for the same conduct as Moss also answered the cellular telephones, took orders for crack cocaine, and delivered the crack cocaine ordered, as well as used firearms to protect the house and its contents.  See id.  Given that Moss performed the same role within the conspiracy as most of his co-conspirators, he was not less

38

culpable than most other participants in his relative conduct.  See id.  While

Branch testified that, while in jail, Moss indicated that his role differed because he

sold only "light" quantities of crack cocaine, while others sold "heavy duty"

quantities, Moss failed to pursue this and prove that he sold less crack cocaine than

the others at sentencing.  See Boyd, 291 F.3d at 1277.  For these reasons, the

district court did not clearly err in denying a § 3B1.2 minor-role reduction, or other

mitigating-role reduction.  See DeVaron, 175 F.3d at 937.

### d. Reasonableness

The district court must impose a sentence that is both procedurally and

substantively reasonable.  United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th

Cir. 2006); Gall v. United States, 552 U.S. __, 128 S.Ct. 586, 597, 169 L.Ed.2d

445 (2007).  The Supreme Court has held that the reasonableness of a sentence is

reviewed under an abuse-of-discretion standard.  Gall, 552 U.S. at __, 128 S.Ct. at

597.  "[T]he party who challenges the sentence bears the burden of establishing

that the sentence is unreasonable."  United States v. Talley, 431 F.3d 784,788 (11th

Cir.  2005).

The Supreme Court has explained that a sentence may be procedurally

unreasonable if the district court improperly calculates the guideline imprisonment

range, treats the Sentencing Guidelines as mandatory, fails to consider the

39

appropriate statutory factors, bases the sentence on clearly erroneous facts, or fails to adequately explain its reasoning. Gall, 552 U.S. __, 128 S.Ct. at 597. The Supreme Court also has explained that review for substantive reasonableness involves inquiring whether the statutory factors in § 3553(a) support the sentence in question. Gall, 552 U.S. __, 128 S.Ct. at 598-99. Pursuant to § 3553(a), the sentencing court shall impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing listed in § 3553(a)(2), namely reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, deterring criminal conduct, protecting the public from future criminal conduct by the defendant, and providing the defendant with needed educational or vocational training or medical care. See 18 U.S.C. § 3553(a)(2). The statute also instructs the sentencing court to consider certain factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1).

In considering the § 3553(a) factors and explaining the reasoning behind its choice of sentence, the district court need not discuss or state that it has explicitly considered each factor of § 3553(a). Talley, 431 F.3d at 786. Rather, even a brief explanation of its reasoning, coupled with a clear consideration of the parties' arguments, will suffice. See Rita v. United States, 551 U.S. __, 127 S.Ct. 2456,

40

2469, 168 L.Ed.2d 203 (2007).

The district court did not impose an unreasonable sentence on Moss or Cooper. See Talley, 431 F.3d at 786. Regarding Moss's sentence, Moss argues only that his sentence was "greater than necessary" because the district court should have applied a minor-role reduction. As discussed above, however, the district court correctly calculated the guideline range in this respect, such that Moss's sentence was not unreasonable for this reason. See Gall, 552 U.S. __, 128 S.Ct. at 597.

Regarding Cooper's sentence, Cooper argues only that his sentence was "greater than necessary" because his co-indictees testified that he did not actually deal crack cocaine. As discussed above, however, sufficient evidence supported his conviction for conspiring to deal crack cocaine, such that Cooper's sentence was not unreasonable for this reason. Also, in choosing a sentence, the district court explained that it especially was influenced by the need to protect the public from future criminal conduct by the defendant and the history and characteristics of the defendant, which are considerations outlined in § 3553(a). See 18 U.S.C. § 3553(a)(1), (2). Likewise, the district court specifically instructed that Cooper should receive mental health counseling, which is in keeping with one of the purposes of sentencing. See 18 U.S.C. § 3553(a)(2). Therefore, because the

district court considered the § 3553(a) factors, adhered to the purposes of sentencing, and explained its choice of sentence, it did not impose a procedurally or substantively unreasonable sentence on Cooper. See Gall, 552 U.S. __, 128 S.Ct. at 597-99; Rita, 551 U.S. __, 127 S.Ct. at 2468-69. For these reasons, Moss's and Cooper's sentences were reasonable.

## III.

In conclusion, because the district court did not abuse its discretion in allowing evidence of Officer's Shear's shooting, err in denying Moss's and Cooper's motions for judgments of acquittal, clearly err in denying Moss a minor-role reduction, or impose unreasonable sentences on Moss and Cooper, we affirm Moss's and Cooper's convictions and sentences.

**AFFIRMED.**